## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**ARNOLD JASON KOVACIK,**

**Plaintiff,**

**vs.**                                                  **CIVIL ACTION NO. 3:17-CV-03620**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

**Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered July 18, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 20 and 25.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings to the extend he seeks remand (Document No. 20.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 25.); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner

pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings as explained *infra*.

**Procedural History**

The Plaintiff, Arnold Jason Kovacik (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on May 1, 2013, alleging disability since May 1, 2011, because of "PTSD, depression, lower back pain, memory loss, right knee pain, shoulder pain, hand pain in both hand, and gets aggravated easily." (Tr. at 388.) His claim was initially denied on October 16, 2013 (Tr. at 170-174.) and again upon reconsideration on January 29, 2014. (Tr. at 176-178.) Thereafter, Claimant filed a written request for hearing on March 14, 2014. (Tr. at 179-180.)

An administrative hearing was held on May 14, 2015 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 123-144.) At the conclusion of the hearing, the ALJ left the claim open to receive additional evidence. (Tr. at 142.) On November 24, 2015, a supplemental hearing was held again before ALJ Buel, and again, the ALJ left the claim open to receive additional evidence. (Tr. at 86-121.) On February 12, 2016, the ALJ entered an unfavorable decision. (Tr. at 33-62.) On April 8, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 271-273.) The ALJ's decision became the final decision of the Commissioner on May 18, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On July 15, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.)

Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 20.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 25.), to which Claimant filed his Reply. (Document No. 26.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 35 years old as of the alleged onset date, and therefore considered a "younger person" throughout these proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 54.) Claimant has a high school education and has specialized training in welding. (Tr. at 389.) Claimant was employed at substantial gainful activity levels on May 1, 2011 as a driller/truck driver. (Tr. at 378.) He was released from work for medical reasons and received workers compensation from June 2011 through November 2011; he returned to the workforce as a truck driver from October 29, 2011 to November 4, 2011, however it was not at substantial gainful activity level. (Tr. at 375, 378.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c).

If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

### Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2016. (Tr. at 38, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of May 1, 2011. (Tr. at 39, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: right knee disability; low back disorder; various arthralgias; posttraumatic stress disorder; and depressive disorder. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.)

6

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work, and therefore capable of

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, sitting for 6 hours, and standing and walking for 6 hours, all in an 8-hour work day, except this individual can never climb ladders, ropes, or scaffolds. However, he can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch or crawl. This person can have no exposure to hazards, heights or moving machinery. This individual would be allowed occasional contact with supervisors, co-workers and the public. He is limited to simple or detailed work, but not complex work.

(Tr. at 41-42, Finding No. 5.) At step four, the ALJ found Claimant was incapable of performing his past relevant work. (Tr. at 54, Finding No. 6.) In addition to the immateriality of the transferability of Claimant's job skills pursuant to the Medical-Vocational Rules, the ALJ found Claimant's age, education, work experience and RFC indicated that there are jobs that exist in significant numbers in the national economy that he could perform. (Tr. at 54-55, Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from May 1, 2011 through the date of the decision. (Tr. at 56, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ erred in two main areas: the first is that he failed to adhere to the special deference standard pursuant to the Regulations and the Commissioner's own Social Security Ruling ("SSR") 96-2p when evaluating the opinion of Claimant's long-term treating psychologist, Dr. Mark Mason. (Document No. 20 at 14-16.) The ALJ gave Dr. Mason's opinion "little weight", expressly noting that Dr. Mason "apparently relied quite heavily" and that he accepted Claimant's subjective complaints as truth; however, Dr. Mason testified in both hearings, therefore, the ALJ had ample opportunities to question him if he had actually based his opinion largely on what Claimant reported or on his own professional observations. (Id. at 16-17.)

Accordingly, Claimant contends that the ALJ did not provide good reasons for not giving Dr. Mason's opinion controlling or great weight as required under the Regulations and this District's jurisprudence, and therefore unsupported by substantial evidence. (Id. at 17-18.)

As for the second alleged error, Claimant asserts that the ALJ did not account for his moderate difficulties in concentration, persistence, or pace in his RFC assessment, despite so finding. (Id. at 18.) In short, Claimant argues that the ALJ failed to explain how these moderate difficulties translated into specific mental limitations, or why a hypothetical question to the vocational expert including the mental restrictions was unnecessary, which violates the holding in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). (Id. at 18-20.)

Claimant contends that the ALJ's decision is not supported by substantial evidence and asks this Court remand this matter for the correction of errors made below. (Id. at 21.)

In response, the Commissioner states that the ALJ properly gave little weight to the opinions provided by Dr. Mason because of the contrary persuasive evidence of record and because of the ALJ's recognition that Dr. Mason relied heavily on Claimant's subjective reports that he uncritically accepted as true. (Document No. 25 at 10-12.) Moreover, the ALJ referenced the other reports in the record, including treatment notes from Claimant's treating providers at Womencare, Inc. and St. Mary's, as well as Ms. Bodkin's consultative examination findings, and explained how they belied Plaintiff's statements to Dr. Mason, as well as Dr. Mason's opinions. (Id. at 12-13.)

With respect to the RFC assessment, the Commissioner further asserts that the facts in Mascio are distinguishable from this case: though Claimant had moderate limitation in his ability to maintain concentration, his persistence and pace were normal. (Id. at 13-14.) The ALJ accounted for this limitation in the RFC, which not only considered Ms. Bodkin's opinion that

Claimant could stay on task and maintain pace within normal limits, as well as her finding that Claimant had a normal ability to maintain concentration, and reconciled Ms. Bodkin's findings with Dr. Mason's testimony and Dr. Goudy's opinion that Claimant had marked limitations in his ability to maintain concentration. (Id. at 14.) Because the ALJ explicitly found that Claimant had a normal ability to stay on task and maintain pace, no further restriction in the hypothetical question regarding persistence or pace was warranted, and therefore remand pursuant to Mascio is unwarranted. (Id.)

The Commissioner asserts that her final decision is supported by substantial evidence and should be affirmed. (Id. at 15.)

In reply, Claimant reasserts that the ALJ's error in evaluating Dr. Mason's opinion is demonstrated by numerous factors, for starters, the diagnosis of mental impairments are not supported by objective medical evidence, but typically are based on a patient's subjective complaints. (Document No. 26 at 1-2.) In addition, the ALJ's explanation for the light weight he gave Dr. Mason's opinion is fraught with illogical assumptions and inconsistencies: the ALJ only referenced one other report from Womencare, Inc., which not only was not a mental health report, but also, the ALJ only referenced information from the report that supported his conclusions, and conveniently ignored other information that actually supported Dr. Mason's opinion, such as Claimant's depression, sleep disturbances, and other problems he suffered as a result of sleep issues. (Id. at 3.)

Claimant also argues that paradoxically, the ALJ relied heavily on Ms. Bodkin's report, and favored her report to the extent it supported his conclusions, but again, ignored her findings that supported Dr. Mason's opinion, as well as Claimant's abnormal mental state. (Id. at 3-4.) In

another instance, the ALJ devalued Dr. Goudy's opinion, though it was consistent with Dr. Mason's opinion, because he was just a one-time examiner, just like Ms. Bodkin, but the ALJ gave her opinion more weight, just like he did with Dr. Buban's opinion, despite the fact Dr. Buban never examined Claimant. (Id. at 4.) Inexplicably, the ALJ noted Dr. Buban was able to observe Claimant during the hearing, which is contrary to the Agency's own rules prohibiting mental examinations during administrative hearings. (Id. at 4-5.)

Claimant contends that the ALJ's skewed reasoning for devaluing Dr. Mason's opinion is not a good reason for rejecting the long-time treating psychologist's opinion. (Id. at 5.) In finding Claimant's mental impairments severe at step two, the ALJ was ostensibly aware that Dr. Mason would not have relied upon objective medical evidence when he treated Claimant's mental impairments, which complies with Diagnostic and Statistical Manual of Mental Disorders standards for treating them. (Id.) Therefore, Dr. Mason's reliance on Claimant's subjective complaints does not discredit his opinions or treatment, and more importantly, the ALJ did not provide the contrary persuasive evidence required when an adjudicator does not give a treating source opinion controlling weight. (Id. at 5.)

Claimant argues these errors require remand. (Id.)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

The Medical Records:

On February 2, 2011, Claimant presented to Mercy Tyler Hospital emergency department

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

after being involved in a motor vehicle accident. (Tr. at 488.) Claimant was the unbelted driver of a truck that slid and hit a tree. (Id.) He had a cut on his left thigh but refused stiches. (Tr. at 489.) An x-ray of his lumbar spine revealed evidence of an old compression fracture but no other abnormalities. (Tr. at 467.) X-rays of Claimant's pelvis, cervical spine, facial bones, right wrist, and both knees were all negative. (Tr. at 472, 475, 497-499.) Kwangsup K. Sheen, M.D., discharged Claimant the same day in stable condition. (Tr. at 493-496.)

Following his motor vehicle accident, Claimant underwent treatment for his back at St. Mary's Occupational Health Center from June through December 2011. (Tr. at 502-538.) He explained that because he was not wearing a seat belt during the accident, he slid behind the seat of his semi. (Tr. at 502.) Claimant claimed that he experienced flashbacks following the accident and was taking Lexapro for "what is considered a PTSD". (Id.)

During all but one of his clinical examinations, Claimant had no psychiatric abnormalities, including a normal affect, normal judgment and insight, normal speech, and normal orientation. (Tr. at 504, 507, 510, 513, 516, 519, 523, 526, 530, 533.) Only during one examination did he display a flat affect, but nonetheless he had a pleasant mood. (Tr. at 537.) During this period, Claimant reported applying for a job he thought he could perform, but he did not accept the job because he was required to lift a "200 lb." pole. (Tr. at 532.)

Claimant also underwent physical therapy at MedCare from September through December 2011. (Tr. at 539-566.) On October 10, 2011, Claimant stated that he drove 700 miles the previous day to take a driving test for work. (Tr. at 547.) Two weeks later, he stated that he was looking to accept a job driving a truck, and that the job could turn into a supervisory position. (Tr. at 551.) Claimant asked for a work release to start the new job. (Tr. at 552.) Claimant cancelled his

appointments on October 31 and November 1, 2011 because he was working. (Tr. at 556.)

Amir Katz, M.D. treated Claimant from January through August 2012. (Tr. at 567-578.) During the initial examination, and contrary to Claimant's hospital records and previous statements, he told Dr. Katz that he had "suffered multiple injuries as a result of the accident." (Tr. at 573.) Claimant specifically denied experiencing any memory loss. (Tr. at 574.)

Beginning February 2013 until November 2015, Claimant underwent counseling at New Life Christian Counseling Center. (Tr. at 586-599, 644-646, 647-666, 667-669, 823-832, 853-870.) Treatment notes show that during this period, Mark R. Mason, Ph.D., LPC, Claimant's counselor, noted that Claimant had a depressed mood (Tr. at 590.), an anxious affect (Id.), and a down mood, although he denied suicidal intent. (Tr. at 586-599, 647-669, 823-832, 853-870.)

On February 14, 2013, following his initial examination of Claimant, Dr. Mason completed an employment summary for the State of West Virginia Department of Health and Human Resources. (Tr. at 597.) Dr. Mason opined that Claimant would be "unable to ever go back to work" due to severe anxiety, depression, and insomnia due to nightmares and flashbacks of his "traumatic" motor vehicle accident. (Id.)

On December 22, 2014, Dr. Mason wrote a letter to Claimant's attorney stating that Claimant's chronic pain caused him to have severe depression resulting in anhedonia, insomnia, agitation, anger, dysphoric mood, poor concentration, poor attention, helplessness, and hopelessness. (Tr. at 647.) He opined that Claimant was one of the "worse cases" he had ever seen. (Id.)

On May 13, 2015, in a letter submitted by Claimant's attorney, Dr. Mason noted that Claimant lived with three "former trained police dogs" in a shed. (Tr. at 668.) He stated Claimant

had no friends and rarely left his shed. (Id.) Dr. Mason stated that Claimant had cameras up outside his shed that he monitored from the inside and from his phone. (Id.) Dr. Mason recommended that Claimant receive immediate treatment for his chronic pain, continued treatment for depression, immediate psychiatric intervention for his depression and anxiety, and financial assistance to get him out of his "pathetic" living situation. (Tr. at 669.)

Shortly thereafter, on November 17, 2015, Dr. Mason prepared an addendum to his May 2015 letter and stated that Claimant's PTSD, depression, and anxiety were severe enough to cause him to "be socially phobic." (Tr. at 854.) He opined that Claimant's depression and anxiety had increased and that Claimant was agitated and hopeless. (Id.) Dr. Mason opined further that Claimant's PTSD sequelae from the motor vehicle accident had been improving, reducing his nightmares and flashbacks, however, Dr. Mason concluded, reluctantly, that Claimant was unable to be retrained to do any job. (Tr. at 855.)

On October 2, 2013, DDS examiner Elizabeth A. Bodkin, M.A. performed an evaluation of Claimant. (Tr. at 606-612.) During the examination, Claimant reported, contrary to his hospital treatment notes and past representations, that he had a broken wrist, dislocated shoulder, and a partially amputated finger following his motor vehicle accident. (Tr. at 607.) On examination, Claimant exhibited a good attitude and was cooperative, interacted appropriately with the psychologist during the evaluation, had relevant and coherent speech, and displayed a normal thought process. (Tr. at 608.) Although Claimant had a dysphoric mood and restricted affect, he had fair insight, normal judgment, denied suicidal ideation, and had normal memory and concentration. (Id.) Ms. Bodkin opined that Claimant had a normal ability to maintain persistence and his ability to maintain pace was also normal. (Tr. at 610.)

Claimant underwent treatment at Womencare, Inc. from April through November 2015. (Tr. at 871-883.) During this time, he consistently presented with a normal mental status including a normal mood and affect. (Tr. at 872, 874, 877, 880.)

On October 29, 2015, Tony Goudy, Ph.D. performed a psychological consultative evaluation at the request of Claimant's attorney. (Tr. at 843-852.) Claimant appeared at the evaluation with his dog and told Dr. Goudy that the dog helped him "keep it together." (Tr. at 843.) Dr. Goudy reported that Claimant was extremely edgy, had a blunted affect, did not generate spontaneous conversation, claimed that suicide had "crossed his mind," and appeared paranoid. (Tr. at 847.) On examination, Claimant had intact immediate memory, moderately to markedly limited recent memory, and a moderately impaired remote memory. (Id.) Claimant also appeared to have markedly impaired concentration. (Id.)

Dr. Goudy completed a mental assessment of Claimant's ability to perform work-related activities and found that Claimant had moderate or marked limitation in almost all mental work-related areas. (Tr. at 851-852.)

**The Administrative Hearing, May 14, 2015**

Medical Expert Judith Brendemuehl, M.D. Testimony:

Dr. Brendemuehl testified that Claimant's medical status was "confusing" to her and stated that medical records from Mercy Memorial Hospital[3] showed that he was treated there on February 2, 2011 after a car accident where an unbelted driver of a truck struck a tree. (Tr. at 131.) She stated that the records showed Claimant had abrasions and cuts, had x-rays done, that he refused sutures and was sent home, but that no loss of consciousness, no nausea and vomited noted. (Id.)

---

[3] (Tr. at 466-501.)

She contrasted these records with another part of the record[4] indicating that Claimant had an extensive history of loss of consciousness and a host of injuries. (Id.) Dr. Brendemuehl stated that at the consultative psychological examination[5], it was noted that Claimant had a dislocated shoulder, a broken wrist, and a partial amputation of the finger from the accident, but the doctor noted that these were past occurrences. (Tr. at 131-132.) She stated that x-rays taken after the accident showed an old anterior compression fracture at L1 and some degenerative changes of C5-6 that were not acute. (Tr. at 132.) She noted that Dr. Katz's records reference an MRI of his lumbar spine and of his right knee, and neither MRI was in the file, and that Dr. Katz opined neither one of those problems were going to require surgery. (Id.) She stated that Dr. Katz also mentioned an examination of Claimant's right wrist and shoulder, but the results are not in the file. (Id.)

Dr. Brendemuehl testified that there was also a note in the record that Claimant was evaluated by Dr. Cox, an orthopedist, but those records were also not in the file. (Id.) She stated that Dr. Nutter, the consultative examiner[6] reported that Claimant was taking Morphine, Percocet, and Xanax, but he had not had the medications in two weeks. (Id.) She stated that in a treatment note dated December 5, 2012, from Dr. Atkins[7] "that looks like those pain medications have been prescribed," but "I don't have any treating source prescribing those medications." (Id.) Dr. Brendemuehl testified that the focus of the New Life Counseling "is primarily this focus from the - - on the part of the counselor, that he's in this chronic pain, and physicians won't take him on as

---

[4] Dr. Brendemuehl referenced Exhibit 4F, office treatment records from Amir Katz, M.D., dated January 11, 2012 to August 7, 2012. (Tr. at 567-578.)
[5] Dr. Brendemuehl referenced Exhibit 9F, the consultative examination report dated September 10, 2013 from Elizabeth A. Bodkin, M.A. (Tr. at 606-612.)
[6] Dr. Brendemuehl referenced Exhibit 8F, the consultative examination report dated August 26, 2013 from Stephen Nutter, M.D., with Tri-State Occupational Medicine, Inc. (Tr. at 600-605.)
[7] Dr. Brendemuehl referenced Exhibit 5F, office treatment records dated December 5, 2012 from Teays Internal Medicine. (Tr. at 579-581.)

15

a patient, and he needs help." (Tr. at 132-133.)

Dr. Brendemuehl summarized that there were "a whole lot of questions with regard to this record as to what actually the objective evidence is as far as the injuries and problems" and not enough information to answer the questions. (Tr. at 133.) She stated the "only thing that really was revealing" from the consultative examination report from Dr. Nutter was Claimant's truncal flexion was limited to 40 degrees, and he did not squat because of knee pain. (Id.)

Treating Psychologist, Mark Mason, Ph.D. Testimony:

Dr. Mason testified that he was the Clinical Director of New Life Christian Counseling and that he had been a licensed professional counselor since 1993. (Tr. at 134.) He stated that he was very concerned about Claimant's depression, anxiety, reclusiveness, and chronic pain. (Tr. at 135.) He stated that he did not think Claimant could work because he was unable to sit a full hour for a treatment session without having to get up and twist his back. (Id.) He stated that Claimant was always in chronic pain, walking around the premises of the office, and he opined that Claimant could also not stand for long. (Id.)

Dr. Mason opined that Claimant was very depressed because he was unable to do anything whereas he used to be quite active. (Id.) He testified that Claimant was "100% redneck, meaning that he wants to be left alone, and he doesn't want to be bothered by anybody." (Id.)

Dr. Mason testified that he had been seeing Claimant about every two weeks or more, and his symptoms of back pain and chronic pain had not changed; he believed Claimant's symptoms were legitimate. (Tr. at 135-136.) He stated that he was also really concerned about Claimant's life, he made an appointment to see Claimant at the shed in which he lived although he did not generally go to patients houses. (Tr. at 136.) He stated that he wanted to observe Claimant's

lifestyle and that he had lost everything so he was trying to help him work through his grief, depression and anxiety. (Id.)

Dr. Mason testified that if Claimant were in a job setting he would need to be away from the public and not interact with the public. (Tr. at 137.) He stated that Claimant's people skills were really low. (Id.) He noted that Claimant would have a difficult time walking for very long or sitting for very long. (Id.)

Dr. Mason testified that it was difficult to separate how many of Claimant's symptoms were attributable to pain and how many were attributable to mental impairments. (Id.) He stated that Claimant's mental condition was directly due to his physical condition. (Id.) Dr. Mason testified that he had witnessed Claimant's pain interfere with his concentration in that they had been required to interrupt many sessions so that he could get up and stretch or go out the door and walk up and down the hall in order to then be able to sit back down and talk for the entire hour long session. (Tr. at 138-139.) He stated that his prognosis was poor unless there was an intervention for treatment of his chronic pain, as well as financial assistance so he could live somewhere other than a shed. (Tr. at 139.) He testified that he was concerned that if Claimant's life did not change that he may end up trying to commit suicide due to his severe depression. (Tr. at 139-140.)

Psychological Expert Mary Buban, Psy.D. Testimony:

Dr. Buban testified that there were not enough "objectives" in the record, stating that there was an IQ test which showed low average IQ, memory within normal limits, concentrations within normal limits, and social function within normal limits in the office setting. (Tr. at 140-141.) Dr. Buban stated that the Cognistat showed memory was mildly limited and that Claimant had a

diagnosis of posttraumatic stress disorder. (Tr. at 141.) She stated that she "was not seeing in the objectives that I have in the record are that there's any significant limitation based on the psychological psychiatric." (Id.) She stated that although Dr. Mason indicated the predominance of his psychological problems were due to chronic pain, there is no evidence to substantiate the chronic pain. (Id.) She stated that she would limit Claimant to no contact with the public and no close integrated teamwork, but no other job restrictions. (Id.)

**The Supplemental Hearing, November 24, 2015**

Medical Expert Judith Brendemuehl, M.D., Testimony:

Dr. Brendemuehl testified that there were now records in the file from the date of Claimant's accident, February 2, 2011, and they showed that he was treated briefly and that all x-rays were normal. (Tr. at 95.) She testified that there were also two sets of MRI in the record of Claimant's right knee and lumbar spine, one set from July 2011 and one from April 19, 2012.[8] (Id.) She testified that the MRIs of the right knee showed mild soft tissue swelling in the prepatellar area and no other abnormalities, while the MRIs of the lumbar spine showed disc desiccation and mild bulges, but no herniation. (Id.)

She testified that there were two examinations in the record, one from June 2011 wherein the doctor stated that Claimant was not at MMI [maximum medical improvement] and recommended physical therapy and further treatment. (Tr. at 96.) The other examination, the consultative examination by Dr. Nutter, reported that Claimant was on Morphine, Percocet, and Xanax, but had been out of those medications for about two weeks. (Id.) Dr. Nutter's examination revealed two positive findings, that Claimant had a forty degree truncal flexion and that he was

---

[8] Dr. Brendemuehl testified that both sets of MRIs were contained in Exhibit 23F. (Tr. at 796-802.)

not able to squat due to right knee pain. (Id.)

According to Dr. Brendemuehl, Claimant had complained of chronic pain, but had very little in the way of objective evidence with regard to pain generators. (Id.) She testified that there was no listing met or equaled. (Id.)

Dr. Brendemuehl testified that Claimant's residual functional capacity would be for medium work, as the State agency physicians had opined, but that he would also be precluded from climbing ladders, ropes and scaffolds, should avoid hazardous machinery, and his other posturals would be occasional. (Tr. at 96-97.) She stated that the only objective evidence that could be the source of his pain were a bulging disc and disc desiccation. (Tr. at 97.)

In response to questioning by Claimant's attorney, Dr. Brendemuehl testified that the lumbosacral x-ray done on February 18, 2011[9] that showed moderately severe compression deformity of the endplate of L1 was shown to be secondary to a Schmorl's node in the April 19, 2012 MRI. (Tr. at 98.) She stated that Claimant had experienced a disc herniation that had impacted the endplate and on x-ray it looked like a fracture, but that this was not a result of the accident he had. (Id.) She stated that it would not be a basis for pain. (Tr. at 98-99.)

With regard to an EMG study done on May 7, 2012, indicating a diagnosis of L4-L5 radiculopathy, Dr. Brendemuehl testified that EMG findings "are based on interpretation" she did not have the degree of qualification of the person performing the study, but this is the only place in the record where these physical findings were described. (Tr. at 99-100.)

Dr. Brendemuehl testified that she had not seen any of the medical records in the file after page 840 of the transcript, the latest three exhibits, one of which included an MRI dated July 21,

---

[9] Claimant's attorney referenced this x-ray contained in Exhibit 1F. (Tr. at 479.)

2015 that was similar to the MRI in 2012, with a small central disc protrusion. (Tr. at 101-102.)

Psychological Expert Mary Buban, Psy.D. Testimony:

Dr. Buban testified that Claimant's primary diagnosis from his treating sources was posttraumatic stress disorder ("PTSD"). (Tr. at 102-103.) She stated that he also had some depressive features. (Tr. at 103.) She stated that the first reference to mental health problems was made on December 5, 2012[10] where there was a complaint of confusion, depression, anxiety and memory loss, and noted that he was taking the prescription medications of Xanax, Soma, Oxycodone and Percocet at that time. (Tr. at 103.) She stated that chronic pain and anxiety were diagnosed. (Id.)

Dr. Buban testified that treatment notes from 2013 indicated that his primary complaints were difficulty sleeping, feeling frustrated, and his mood being down.[11] (Id.) She stated that Claimant underwent a psychological consultative evaluation on October 2, 2013 and noted that his memory and concentration were assessed to be within normal limits, his verbal comprehension index was 96, his reasoning index was 89, his working memory was 90, his processing speed was 91 and his full scale IQ was 90.[12] (Id.) She stated that his Cognistat showed a mild memory impairment, his other testing was within normal limits, and he was diagnosed with PTSD. (Id.)

Dr. Buban noted that Claimant was reported doing a little better on December 22, 2014, and that his psychological functioning was normal on September 16, 2011 during a worker's compensation evaluation.[13] (Id.) Dr. Buban testified that Dr. Goudy's October 29, 2015 evaluation

---

[10] Dr. Buban referenced Exhibit 5F, office treatment records from Teays Internal Medicine. (Tr. at 579-581.)
[11] Dr. Buban referenced Exhibit 7F, office treatment records dated February 14, 2013 to April 22, 2013 from New Life Christian Counseling Center. (Tr. at 586-599.)
[12] Dr. Buban testified that this evaluation report was in Exhibit 9F, provided by Elizabeth A. Bodkin, M.A. (Tr. at 606-612.)
[13] Dr. Buban cited these records were from Exhibits 13F and 20F, respectively. (Tr. at 646-666, 731-791.)

showed a self-reported Beck Depression Inventory was severe, a self-reported Beck Anxiety Inventory was severe, and a self-reported PTSD inventory was severe. (Tr. at 103-104.) She noted that Dr. Goudy diagnosed major depressive disorder, recurrent severe, posttraumatic stress disorder, chronic, generalized anxiety disorder, and paranoid personality disorder. (Tr. at 104.) Dr. Buban stated that Dr. Goudy assessed Claimant under listing 12.06(A)(5) and found that his activities of daily living were mildly to moderately impaired, that his social functioning was markedly limited, and that his concentration, persistence, and pace were markedly limited, but that he had experienced no decompensations. (Id.) Dr. Buban testified, "it's pretty unusual to have a PTSD development and long term symptoms for this particular type of event." (Id.) She also stated that nowhere in the record indicated he had been prescribed medications that could be helpful to an individual complaining of nightmares. (Id.)

Dr. Buban testified that Claimant's treating source and consultative examiner Dr. Goudy had found that Claimant had severe limitations, but the consultative examiner who saw him in October 2013 found no limitation for concentration and attention, that his intellectual functioning was all within the low average to average range, and Cognistat was only mildly limited. (Tr. at 104-105.) She stated that Claimant's symptoms would have had to have become much more severe after the consultative examination on October 2, 2013. (Tr. at 105.)

Dr. Buban testified that if she were to take Claimant's treating source, Dr. Mason, and Dr. Goudy's evaluation, then those records supported a finding of meeting or equaling a listing, which describe Claimant's activities of daily living being mild to moderate, social functioning being marked, and concentration, persistence or pace being marked. (Id.) She stated that no other records supports a meeting or equaling of a listing. (Id.) Dr. Buban testified that the "objectives" in

Claimant's mental health treatment suggest that he had such marked limitations as far back as December 2014, or November 2014, when "he had a verbal confrontation with a neighbor, which would indicate poor impulse control, and irritability."[14] (Tr. at 105-106.)

Dr. Buban testified that if Dr. Mason's and Dr. Goudy's opinions were disregarded, then she would assess his activities of daily living as mildly limited, his social functioning would be moderately limited, and his concentration, persistence, or pace would be mildly limited, although occasionally he would have moderate limitations due to pain. (Tr. at 106.) She reiterated that she did not see anywhere in the record that Claimant was on the appropriate medication for nightmares as a result of PTSD. (Tr. at 107.)

In response to questions from Claimant's attorney, Dr. Buban testified that Claimant had been receiving consistent mental health treatment since February 2013. (Id.) She confirmed that there was no indication in the record that his treating psychologist thought he was exaggerating or malingering. (Id.) She agreed that Claimant's recorded symptoms of frustration, depression, trouble sleeping, and anxiousness had been consistently reported since 2013. (Id.)

Treating Psychologist, Mark Mason, Ph.D. Testimony:

Dr. Mason testified that he was a licensed professional counselor as well as an ordained Baptist minister. (Tr. at 108.) He testified that he had been the mental health professional that had seen Claimant the most in the past several years and that his evaluations were not a "blind" evaluation based on a review of assessments or notes. (Id.) Dr. Mason stated that he did not write his notes for courts, but to make notes for himself to remind himself of things. (Id.) He stated that

---

[14] Dr. Buban testified that "[t]here's no date, other than 11/14" and that "[t]his is on Page 4, of [Exhibit] 13F[.]" (Tr. at 106, 650.) The undersigned notes that this entry occurs above another entry dated November 20, 2014 in Dr. Mason's handwritten progress notes. (Tr. at 650.)

he did not have time to take verbatim notes in private practice. (Tr. at 108-109.) Dr. Mason further stated that he believed that he knew Claimant better than the medical experts at the hearing. (Tr. at 109.)

Dr. Mason testified that Claimant's PTSD sequelae – flashbacks, nightmares, and insomnia – had been improving since he started counseling with him, but that his depression and anxiety had slowly gotten worse, to the point of agitation and acting out, because of his life circumstances and his chronic pain. (Id.) He stated that although most of the many patients he had seen in twenty-six years of practice got better with treatment, Claimant was not getting better. (Id.) Dr. Mason noted that Claimant got very anxious about his SSA hearings and that he had exhibited signs of agitated depression, anxiety, and social phobia. (Tr. at 109-110.)

Dr. Mason stated that he had visited Claimant in his living situation – a shed – where he lived with three dogs. (Tr. at 110.) He stated that the shed had no running water, no toilet, and no kitchen, but was about one hundred to two hundred yards from his mother's house. (Id.)

Dr. Mason testified that he had Claimant come out and help his staff plant flowers the past spring, in an attempt to help him get some socialization, but he was unable to do much of anything. (Id.) Dr. Mason stated that as challenging as Claimant was to his doctors, with whom he disagreed, he would be just as challenging to any boss that he had or anybody who disagreed with him. (Tr. at 111.) He stated that Claimant would probably have verbal and physical confrontations with others, and had a history of that in the past, noting that his depression and anxiety "turned into a flavor of agitated depression." (Id.)

Dr. Mason testified that Claimant attempted to do things, he wanted to do things, and he wanted to help out, but he was frustrated because he could not. (Id.) Dr. Mason stated that Claimant

"loses his train of thought" and "can't seem to do much of anything." (Id.) Dr. Mason testified that the limitations Claimant had did not stem from his PTSD, but rather from his depression, anxiety, and some paranoia. (Tr. at 112.) Dr. Mason noted Claimant had to constantly move around while in his office, and he brought one of his dogs with him; he stated the dogs were sensitive to his emotional changes and climbed on him to try to calm him down. (Id.)

Dr. Mason pointed out that Claimant had previously been very active, training dogs in addition to working. (Tr. at 112-113.) He noted that Claimant is a rural "redneck" type of man who would never have started therapy unless there was something majorly wrong. (Tr. at 113.)

In response to questions from Claimant's attorney, Dr. Mason stated that Claimant is not employable. (Id.) He stated that his concentration, persistence and pace would be "very marked." (Tr. at 113-114.)

Dr. Mason testified that he believed that a "blind interpretation" of Claimant's test records without meeting the patient was unethical under the Code of Ethics of the American Psychological Association ("APA"). (Tr. at 114-115.) He stated that psychological tests are "hypothesis generators" meant to either support or deny a clinical evaluation according to the APA. (Tr. at 115.) He stated that he wanted to be on record as being against the opinions offered by the psychological expert. (Tr. at 115.)

Vocational Expert ("VE") Patricia Posey Testimony:

The VE testified that Claimant's past work as a drill press operator was light and semi-skilled work, and as a driller operator was medium and skilled work. (Tr. at 117.) She testified that there were no lesser exertional occupations to which Claimant's skills would transfer. (Id.)

The ALJ asked the VE to assume an individual of the same age and with the same education

and work background as Claimant, and to assume that the individual was limited to light work, who would be unable to climb ladders, ropes, or scaffolds; who could perform other postural activities only occasionally; who should have no exposure to heights, moving machinery, or hazards; who was afflicted with chronic pain noticeable to himself at all times, but could maintain attention and concentration in two-hour increments, with a normal morning break, lunch break, and afternoon break; who should have no exposure to, from a social perspective, supervisors, co-workers, and the public; and would be off task at least 50% of each day outside of the normal apportioned breaks. (Tr. at 118.) He asked the VE whether such an individual could perform any of Claimant's past jobs and the VE stated that he could not and would, in fact, not be able to work at all. (Tr. at 118-119.) The VE confirmed that even if the individual were off task 20% of the time, her opinion remained the same. (Tr. at 119.)

The ALJ asked the VE to further assume that the previously described individual, from a mental perspective, could have occasional contact with supervisors, co-workers, and the public, and would be limited to simple, or detailed work, not complex work, and asked the VE if there were jobs in the national economy that such an individual could do. (Id.) The VE stated that such an individual could work as a laundry worker, a folder, or a night cleaner, all of which are light unskilled occupations. (Id.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." Blalock, 483 F.2d at 775.

**Analysis**

    As previously stated, Claimant argues the ALJ did not adhere to the special deference

standard that is afforded to the opinions of treating sources, namely, Dr. Mason. (Document No.

20 at 14-18.)

    The Evaluation of Opinion Evidence:

    The Commissioner generally must give more weight to the opinion of a treating physician

because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's

alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is

afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and

laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."

Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The

opinion of a treating physician must be weighed against the record as a whole when determining

eligibility for benefits. 20 C.F.R. § 404.1527(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2).

In this case, the ALJ considered Dr. Mason's testimonies given at both hearings and detailed them in depth, *supra*. (Tr. at 46-47, 49.) The ALJ also reviewed Dr. Mason's treatment notes as part of his analysis and valuation of his expert opinion with respect to the other evidence of record. (Tr. at 48-49, 51, 52-53.) The ALJ noted that Dr. Mason opined that Claimant cannot work and should not work "as he cannot sit or stand for long" and because "he is not people oriented and his people skills are lacking." (Tr. at 50.) In addition, the ALJ noted that Dr. Mason opined that Claimant "could not stay on task . . . was not employable . . . [and] the claimant's concentration, persistence or pace was marked."[15] (Id.)

---

[15] Clearly, to the extent that Dr. Mason opined that Claimant was disabled or unemployable, such a determination is reserved to the Commissioner, and the ALJ had no duty to give it any special significance. 20 C.F.R. § 404.1527(d)(3).

27

The ALJ discussed Dr. Mason's treatment notes, beginning with his summary dated February 14, 2013 that Claimant had posttraumatic stress disorder and "would never be able to go back to work due to his anxiety, depression, insomnia, nightmares and flashbacks due to his tanker truck accident." (Tr. at 51, 597.) Though Dr. Mason testified that Claimant had marked limitations in concentration, persistence, or pace, the ALJ observed that Dr. Mason "documented in March 2013 that the claimant's short-term memory was good, but his chronic pain continued." (Tr. at 51, 588, 666.) The ALJ determined that "[t]he doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (Tr. at 51.) The ALJ then stated, "as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Dr. Mason's notes are not supported by the observation of other treating providers." (Id.) Accordingly, the ALJ assigned Dr. Mason's opinions "little weight." (Id.)

> The ALJ then expounded on his explanation for the weight given to Dr. Mason's opinions:
>
> An example of the contrast between Dr. Mason's treatment notes and other provider's treatment notes can be found within the records of Womencare, Inc. (Exhibit 33F). The claimant was seen on August 25, 2015 (Exhibit 33F, p. 1). (Tr. at 871.) The claimant reported depression, sleep disturbances and restless sleep. However, his mood was normal and his affect was active and alert. His appearance was health[y] appearing, well nourished and well developed. H[e] had no appearance of distress (Exhibit 33F). In contrast, Dr. Mason's notes from 6 days earlier than the Womencare notes document that the claimant's mood was down (Exhibit 32F, p. 13). (Tr. at 865.) Nine days after the report from Womencare, Dr. Mason noted that the claimant's mood was down and his affect was sad (Exhibit 32F, p. 12). (Tr. at 864.) These reports and other reports by provider conflict with the treatment notes of Dr. Mason that were made within the same timeframe. These conflicts and contrasts within the record diminish the effectiveness of the testimony.

(Tr. at 51.)

Claimant argues that the ALJ's use of the word "apparently" is not a "good reason" for the

28

little weight he gave to Dr. Mason's opinions when the psychologist gave testimony at both hearings, thus, the ALJ could have asked Dr. Mason himself what he based his opinions on. (Document No. 20 at 16-18.) As an initial matter, the undersigned agrees with Claimant that the very nature of mental impairments necessarily consistent of subjective symptoms, and normally, a mental health provider's reliance on them would be appropriate for the diagnosis and treatment of mental impairments. (Document No. 26 at 2-3.) In further support of his argument that the ALJ improperly evaluated Dr. Mason's opinion, Claimant challenges the weights afforded to other opinions, specifically, those provided by Dr. Goudy and Dr. Buban.[16] (Document No. 26 at 3-5.) Additionally, Claimant takes issue with the ALJ's notation that Dr. Buban "observed" Claimant during the hearing violates the Agency's own rules against having a medical expert conduct any type of mental status examination during the hearing. (Document No. 26 at 4-5.)

Dr. Buban's testimonial opinion was given "great weight", and indeed, enjoyed greater weight than the psychological opinions provided by providers who actually treated or examined Claimant. (Tr. at 50.) Even though the ALJ recognized that "the opinion of a non-examining source is entitled to less weight than the opinion of a treating or examining source", the ALJ recognized Dr. Buban as a mental health specialist who is familiar with social security programs and the evidentiary requirements, and "[m]ost importantly, her opinion regarding the claimant's functional limitations is highly credible because it is well supported by the objective medical evidence and gives minimal weight to the ever changing self-reports provided by the claimant." (Id.)

Regarding Dr. Goudy's opinion, Claimant argues that the ALJ acknowledged its

---

[16] Claimant argues that the ALJ "relied heavily" on Ms. Bodkin's psychological consultative report, as he clearly based the special technique analysis and resultant RFC limitations are reflections of her findings, though he ignored or "brush[ed] aside" the abnormal mental findings in her report, however, the undersigned notes that the ALJ did not explicitly assign weight to Ms. Bodkin's opinion. (Document No. 26 at 3-4.)

consistency with Dr. Mason's opinion, which even Dr. Buban noted during her testimony. (Id.) Nevertheless, the ALJ gave Dr. Goudy's opinion "little weight", because it was solicited for "evidence for the current appeal" and "not in an attempt to seek treatment for symptoms." (Tr. at 52.) However, after recognizing that such opinions are legitimate and deserving of due consideration, the ALJ found that "[o]nly the claimant's treating counselor finds similar limitations" and that "[b]oth Dr. Goudy and the counselor rely on the claimant's self-reported symptoms." (Id.) Additionally, the ALJ noted Dr. Goudy examined Claimant only once, and that his opinion was not consistent with Claimant's "various treatment records", and was not consistent with Dr. Buban's opinion "who was able to review the entire record and to observe the claimant at the hearing." (Id.)

The ALJ noted that the record showed that Dr. Mason diagnosed Claimant with PTSD, depression and anxiety. (Tr. at 51, 597.) Dr. Goudy diagnosed Claimant with PTSD, major depressive disorder, and anxiety (Tr. at 39, 51, 848.), and Ms. Bodkin diagnosed Claimant with PTSD as well. (Tr. at 39, 45, 609.) The ALJ also acknowledged that Dr. Atkins [*sic*][17] diagnosed Claimant with major depressive disorder. (Tr. at 39, 581.) Even Dr. Buban testified that after her review of the psychological records, she observed that Claimant's primary diagnosis was PTSD, and that he "has some depressive features as well." (Tr. at 45.) There is no evidence in the record that Dr. Mason, Dr. Goudy or Ms. Bodkin arrived at these diagnoses incorrectly or that they were unsupported by the appropriate clinical and laboratory diagnostic techniques. To that extent, the undersigned is uncertain how the ALJ determined Dr. Mason's opinion lacks consistency with the

---

[17] The record shows that on December 5, 2012, James A. Akins, M.D. of Teays Internal Medicine, saw Claimant for the purpose of establishing care, and diagnosed him with "chronic pain, anxiety disorder due to general medical condition with generalized anxiety, and depression." (Tr. at 581.)

record, particularly when the medical records demonstrate substantial consistency to this end. As mentioned above, Dr. Mason began treating Claimant in February 2013, however, even the ALJ acknowledged the medical records indicated Claimant reported depression, anxiety, and lack of sleep since December 5, 2012. (Tr. at 45, 48, 579-581.)

Additionally problematic is that the ALJ noted that "[m]edical records from December 22, 2014[] show the claimant was doing a little better according to [Dr. Mason]." (Tr. at 45, 647.) However, Dr. Mason's notes and letter of that date **do not reflect that at all**: those progress notes reveal that Claimant reported difficulties getting treated for chronic pain and Dr. Mason noted he was "still suffering greatly; severe symptoms." (Tr. at 648.) In a letter dated December 22, 2014, Dr. Mason reported to Claimant's attorney that Claimant "continues to suffer from chronic pain" and that this "has caused him to have severe depression" and that he "cannot get medication for his pain or his severe depression." (Tr. at 647.) Dr. Mason wrote, "[Claimant] is one of the worse [*sic*] cases I have seen in my 25 years of clinical practice." (Id.) The undersigned notes that the ALJ did not arrive at this specific finding in a vacuum: Dr. Buban testified that Dr. Mason's treatment notes indicated that Claimant was "doing a little better" on December 22, 2014. (Tr. at 103.) However, this only further complicates matters and gives additional substance to Claimant's argument that the ALJ improperly weighed the opinion evidence, particularly with respect to the testimonies provided by Dr. Mason and Dr. Buban.

Indeed, these Dr. Mason's treatment records demonstrate that the ALJ's determination that "the record does not reflect this extreme worsening" since October 2013 **is not** supported by the *medical* evidence of record. (Tr. at 46.) This is concerning insofar as Dr. Buban agreed that Claimant received consistent treatment and had complained of these symptoms since 2013. (Id.)

Although Dr. Mason's testimony regarding his personal observations of Claimant's living situation is undisputed, and that the ALJ acknowledged Dr. Mason's testimony that Claimant's PTSD sequela had improved, and that his depression and anxiety had worsened, the ALJ nevertheless noted that this "conflicts with the claimant's report of his activities." (Tr. at 47.) These "activities" included Claimant's statements from his Adult Function report that he cares for his dogs, watches television, performs household chores and has no problems with his personal care. (Tr. at 47, 49, 420-427.) The ALJ also found that "[d]espite informing Dr. Mason that he has no financial support, the report of Dr. Goudy mentions that he has trained dogs in 'bartering situations.' " (Tr. at 49, 845.) Nevertheless, Dr. Mason's opinion regarding Claimant's mental impairments are not contradicted by the medical evidence, and is actually quite consistent to that extent.

In sum, the undersigned **FINDS** that the weight the ALJ assigned to Dr. Mason's testimonial opinions did not comply with the Regulations and the ALJ did not provide good reasons for giving Dr. Mason's opinions less than controlling weight, especially in light of the medical evidence that was consistent with Dr. Mason's opinions. Accordingly, the ALJ's conclusions regarding the opinion evidence concerning Claimant's mental impairments were not "rational" and not based upon substantial evidence. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

<u>Accommodations for Moderate Difficulties in Concentration, Persistence or Pace:</u>

Claimant's second alleged ground for error concerns the ALJ's finding that he had moderate difficulties in concentration persistence or pace, but it is not reflected in the RFC[18], and

---

[18] Claimant asserts that the only mental limitation included in the RFC was a limitation to those jobs requiring only "occasional contact with co-workers and the public" and were "simple or detailed work, but no complex work", however, this fails to account for the moderate limitations in concentration, persistence or pace as found by the ALJ. (Document No. 20 at 18.)

he provided no explanation for its omission, thus necessitating remand pursuant to Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). (Document No. 20 at 18-20.)

At steps four and five of the sequential analysis, an ALJ must determine a claimant's RFC for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). When examining all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1546.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's

33

functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a *per se* rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

In reference to Claimant's moderate difficulties in concentration, persistence, or pace, the ALJ stated:

> Ms. Bodkin documented that the claimant's ability to stay on task and his pace were within normal limits based on clinical observations (Exhibit 9F). However, the undersigned has considered the testimony of Dr. Mason and the report of Dr. Goudy (Exhibit 31F). These sources note that the claimant had marked impairment in memory and concentration. This evidence establishes the claimant has moderate difficulties in concentration, persistence, or pace.

(Tr. at 40-41, 606-612, 843-852.) Next, the ALJ performed the two-step process[19] required to assess Claimant's symptoms with the objective medical evidence, and found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. at 42.) After the discussion of all the relevant evidence of record, including

---

[19] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

the mental health treatment and opinion evidence, *supra*, the ALJ assessed Claimant's mental RFC by limiting Claimant to "occasional contact with supervisors, co-workers and the public" and to jobs requiring "simple or detailed work, but not complex work." (<u>Id</u>.)

During the supplemental hearing, the ALJ asked the VE a hypothetical question where an individual with Claimant's background "would be allowed occasional contact with supervisors, co-workers, and the public, and would be limited to simple, or detailed work, not complex work."[20] (Tr. at 119.) As stated *supra*, the VE opined there was other work Claimant could still perform. (<u>Id</u>.)

The Fourth Circuit held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." <u>Mascio</u>, F.3d at 638. Further, the Fourth Circuit explained that if an ALJ finds that the concentration, persistence, or pace limitation does not affect a claimant's ability to work, then it would be appropriate to exclude it from the hypothetical. <u>Id</u>. A distinguishing characteristic of this particular case is that the ALJ found that Claimant's ability to maintain persistence and pace was normal, although his ability to maintain concentration was moderately impaired, *supra*. Of importance here, the <u>Mascio</u> Court determined that nowhere did "the ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's residual functional capacity." <u>Id</u>. at 640. It was this "lack of explanation," the Court held, which "requires remand." <u>Id</u>.

The ALJ herein acknowledged Dr. Buban's testimony that during her review of the mental

---

[20] The ALJ explicitly stated that the physical component to his first hypothetical question would remain the same and asked the VE to focus on the revised "mental perspective" hypothetical in her testimony. (Tr. at 119.)

health treatment evidence, she found that the record showed Claimant "had memory, concentration and one on one social functioning within normal limits." (Tr. at 45.) Moreover, the ALJ noted that during the first hearing, Dr. Buban found "no sign of a significant limitation based on a psychological impairment" – though the record showed that Claimant was depressed and had trouble with paperwork – "[i]n contrast, his treating mental health provider reports that the majority of his mental health problems are due to chronic pain, but as Dr. Brendemuehl pointed out there are questions about his physical problems."[21] (Id.) The ALJ then observed, "Dr. Buban reflected that if the claimant had severe impairments as noted by Dr. Goudy and Dr. Mason, they would have had to greatly increase in severity after October 2013. The [ALJ] notes the record does not reflect this extreme worsening." (Tr. at 46.)

As noted *supra*, however, Dr. Mason's treatment notes as well as his testimonies suggested that Claimant's PTSD symptoms ameliorated over time, but his depression and anxiety had not. Nevertheless, the ALJ determined from Dr. Buban's testimony that Claimant's mental impairments "caused some moderate limitations in his ability to perform work like activity", although those limitations were not specified. (Tr. at 53.) Interestingly, the ALJ noted that Dr. Buban opined that Claimant would "occasionally" have moderate restrictions in concentration, persistence, or pace "due to pain", and that "the only indications of posttraumatic stress disorder are nightmares, and they would cause no limitations except for sleepiness." (Tr. at 50.) Although the ALJ posed a hypothetical to the VE that included Claimant's mental impairments, restricting

---

[21] Claimant further argues that his testimony concerning his pain symptoms would have also impacted his ability to perform and complete tasks, though the ALJ neglected to address this limitation in the RFC assessment as well. (Document No. 20 at 19.) However, the ALJ "notes that despite the claimant's reports of constant, chronic, pain, his objective medical evidence of record fails to show any significant problems"; this assessment was supported by Dr. Brendemuehl's testimony(-ies) that though the record "is very clear that the claimant has complained of chronic pain, [] there was very little objective evidence in the record to support his complaints." (Tr. at 43, 44.)

him to "occasional contact with supervisors, co-workers, and the public" as well as to "simple or detailed work, but not complex work"(Tr. at 119.), this does not adequately address Claimant's moderate difficulties in concentration under <u>Mascio</u>.

This error is compounded by the ALJ's failure to properly evaluate Dr. Mason's opinion, as it appears from the record to enjoy support from the substantial medical evidence, particularly with respect to Claimant's problems in maintaining concentration due to PTSD symptoms, including sleepiness, which Dr. Buban noted in her testimony. Therefore, an adequate explanation as to why the hypothetical is not needed to address Claimant's limitations in maintaining concentration is necessary. Accordingly, the undersigned **FINDS** the RFC assessment does not adequately account for Claimant's moderate limitations in concentration, and further **FINDS**, the ALJ did not explain why it was unnecessary to include such limitations in the hypothetical to the vocational expert. Accordingly, the undersigned **FINDS** the RFC assessment is not based on substantial evidence.

## <u>Recommendations for Disposition</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (Document No. 20.) to the extent that this matter be remanded back to the Commissioner, **DENY** the Defendant's request to affirm the ALJ's decision (Document No. 25.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C § 405(g) for further administrative proceedings in order for the ALJ to properly evaluate Dr. Mason's

opinion with respect to the functional limitations caused by Claimant's mental impairments, and specifically, how these affect his ability to maintain concentration.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 8, 2018.

Omar J. Aboulhosn
United States Magistrate Judge

38